Clerk, please call the next case. Squadron 10-0720 Donald Elmore v. Collette Please, the court, counsel. Good morning. My name is Jim Penney. I represent Don Elmore in this appeal of the Workers' Compensation Commission's denial of benefits pursuant to Section 19H and Sections 8A of the Workers' Compensation Act. Mr. Elmore suffered injuries as the result of an identifiable accident back in April of 2000 when he was lifting and trying to move a cast iron bathtub. The reports of low back pain were immediately transmitted to his employer and he began a course of conservative treatment. The important dates are in September of 2000. An MRI was performed which demonstrated the existence of degenerative changes from the L2 to the L5 levels. He was treated then, he continued to treat with Dr. Corey conservatively. He was asked to have an independent medical evaluation on November 1st by Dr. Goldberg. Dr. Goldberg felt that Mr. Elmore was suffering from a cervical and thoracic strain and possibly could have a lumbar strain. He wanted to see the MRI studies and there's no indication that the MRI studies were actually transmitted to Dr. Goldberg. In December of 2000, he has an incident at his home where he's toweling off after taking a shower, feels a pop in his back. He has an MRI that's taken in January of 2001, which is positive for a herniated disc at the L4, L5 level. We tried the original work out case in January of 2002. Arbitrator Fred Ianni disallowed any medical care connected with the MRI in 2001, reasoning that the accident, the incident of toweling off in the bathroom, the bathtub, constituted an intervening event. In her decision, arbitrator decision, she found that there was a herniated disc at the L3, L4 level that was never documented in any of the medical records. We took a timely appeal. The case went through the Workers' Compensation Commission and in November of 2002, the commission entered in order on its decision in opinion and review, finding that the petitioner's condition of ill-being, identifying the condition of ill-being to be a herniated disc at the L4, L5 level. The commission increased an earlier permanency award of 6% of the whole person to 12% of the whole person. It also awarded medical benefits consisting of the cost of the MRI that was performed in 2001. In February of 2003, Mr. Elmore filed this petition for additional benefits under the act. Throughout the entire treatment, Mr. Elmore had been treated by Dr. Corey. Dr. Corey was treating the symptomatology that Mr. Elmore had related to the accident of April of 2000. Mr. Elmore's complaints were consistent with right leg radicular pain as well as low back pain. Dr. Corey prescribed a number of different protocols including the injections of the facet joints at the L4, L5 level, he also performed certain testing at the L3, L4 level. This was done in the course of a discogram. The discogram was equivocal at the L3, L4 level, but there was no pathology that was found at the L4, L5 level. Based upon this, Dr. Corey prescribed an IDEP. That's the interthecal disc reduction where it cauterizes the shell of the annulus in order to make the annulus more firm. The thought is that that would relieve and reduce any type of referred pain that was at that region. The respondent had had Mr. Elmore reexamined by Dr. Goldberg. Dr. Goldberg did not believe that the L4, L5 region was the pain generator. He felt that the L3, L4 level was the pain generator, but he testified that it was unrelated to this work injury. He did find that the IDEP procedure was an appropriate method of treating the annular tear that was found in the discogram that was performed in December of 2002. All right. So you've got Corey as a relatively new physician. Okay. It was in private practice for four years. You have sort of conflicting medical opinions, do you not? Yes and no. Okay. I would say the reason why I'm being kind of equivocal on this is that Dr. Corey was a board-certified physiatrist. And it's been my experience that the physiatrists are doctors that are generally, that generally focus on pain issues and try to ascertain what the source of the pain issue is. And that's what Dr. Corey had done repeatedly throughout the course of this case. And I characterize Dr. Goldberg as being kind of a Monday-morning quarterback, because he comes in at different points in time and looks at Mr. Elmore at isolated intervals and reaches certain conclusions. Now, what should be clear from the record is that the responding cut-off all benefits to this gentleman in November of 2000 found that there was a gap in treatment following Dr. Goldberg's examination. Mr. Elmore was not able to get any medical care up until the time that, well, we filed the 19-H petition. And so there's a gap in treatment. And I feel that that was one of the things that helped delay and prolong Dr. Corey's efforts to diagnose what this condition was. Wait a minute. Maybe we're getting ahead of ourselves. Okay. What did the commission find on the first appeal, the first case that went before the commission was never appealed? As to L3-L4? Well, the commission found that it just simply affirmed all other aspects of Arbitrator Fradiani's decision. One of which was that the diagnosed herniated disc at L3-L4 in the treatment for same is not causally related to the accident of April 10, 2000. That's true. And there was no herniated disc at L3-L4. I didn't find a basis to appeal that statement because a herniated disc and an annular tear are not necessarily the same. But let's go back in time. When we saw the MRI results, it focused on there being a disc protrusion at the L4-L5 level, which is consistent with the type of pain that Mr. Elmore was having radiating down his leg. So how does the subsequent surgery done at the L3-L4 level is causally connected to the original injury, then? Well, that's where I think that the board of trustees of the state of Illinois versus the industrial commission is important. Because in that particular case, we had a gentleman who had a back injury. The doctor wished to do a myelogram. They must have made a mistake during the prep because the myelogram could not be performed because there was too much dye in the disc space. So there was no actual diagnosis of there being a herniated disc. This gentleman goes before the commission. There's an award. It's never appealed. He has some type of an intervening incident, and then files his 19-h petition. And the Supreme Court, so he files his 19-h petition. There's additional diagnostic testing done. And it is a herniated disc. By the time another myelogram is done which reveals the existence of a herniated disc. And so the commission awarded this gentleman an increase in benefits pursuant to 19-h, I'm sorry, the arbitrator awarded the benefits pursuant to 19-h. The commission took that away. Okay? It gets appealed directly to the Supreme Court. And at that point in time, the Supreme Court says, we find that there was a material change in this gentleman's condition. The records demonstrate that he now has a herniated disc that was not found by any of the treating doctors in the original proceeding. And that's what we have here. We have Dr. Corey struggling with trying to find what the true pain generator is for this individual so that he can prescribe an appropriate course of treatment. But, you know, the diagnostic studies that eventually come back change his opinion in terms of, you know, is this a herniated disc? What the true pain generator was. He had originally thought it was L4, L5. Later he becomes convinced it's L3, L4. Which is consistent with what Dr. Goldberg says, but they just have differing opinions on what caused that. And my position is, is that we have a man who has an identifiable accident back in April of 2000. We have a progression of symptomatology that lasts from April of 2000 all the way up until December of 2002 when the discogram is performed, which demonstrates an obvious pathology. The IDET procedure is done to treat that particular condition. So I felt that the commission, I'm reading the commission's decision from the 2008 decision, and I'm in agreement, I'm in agreement, I'm in agreement, and then the commission says, we don't award any more medical after December of 2002 because, guess what? We have an injury at the L3, L4 level, which arbitrator Fradiani says is not related. But that's not really what that original decision says, because there is no finding that there was a herniated disc at the L3, L4 level, and even today there's no finding that there's a herniated disc at that level. On the original decision, there was no mention at all of a causal connection to any pathology at the L3, L4 level, was there? Right, and that's why I think that the Board of Trustees case is important, because in that case there was no causal connection for the herniated disc condition. It was later found and awarded in a 19-H petition. So everybody just missed it originally? Everybody missed the pathology or the problems with the L3 and L4? Well, the complaints were always reported, but I would say I'd have to admit that, yeah, they did. I mean, the diagnostic studies, I think, were what put this into focus so that it could be determined what the true problem was. I'm at a little bit of a loss here. You try your case on one theory, you get an award on that theory, and then you can come back under a 19-H and try it again on a different theory? No, no, I hope I'm not wrong. Wait a minute. When did this L3, L4 happen? Well, I'm not sure when that happened. Well, it would have had to have happened at the time of the original incident or at the time of the falling in the shower, wouldn't it? Because nothing else is causally connected. That's true, and there's no evidence of it. So if it happened, it would have been your obligation to try it on L3, L4 at that point in time. You didn't do it. You tried it on L4, L5. How do you get to come back and try it again? Well, I tried it based upon the symptoms that the client had been testifying to. And throughout the entire record, Mr. Elmore testified to a certain set of symptoms. That those symptoms were back pain radiating down the right leg. Now, I'm just a lawyer, and I rely upon the doctors to tell me... I understand that, but that's not my point. My point is you tried the case. You got an award, L4, L5. Nothing for L3, L4. Why do you get to come back later and say, oh, now I'm entitled to L3, L4, even though it happened way back when? Well, I can't be sure when that exactly happened. Well, you'd have to be sure when it exactly happened, because it would have had to have happened either at the time of the original incident or the shower incident. That's all there is. There isn't anything more. Or there can be a natural progression of the degeneration, which is what Dr. Goldberg testified to. Natural progression of what degeneration? Well, we do know that there are... Caused by what? We do know that there are degenerative findings that were in the MRI from September of 2000. We know that there was some type of an insult to the disc at the L4, L5 level. We do know that from a medical standpoint, you can have some compromise of the adjoining discs. And that's what I've seen is that this was some... Wait a minute. If your doctor didn't find it, that's unfortunate. But my question is, if your theory is correct, there could be no end to any workers' compensation case. We'd be back here on M19H in every case there is. I mean, this can't be... I mean, you know, certainly the finding of the industrial commission in the first case was a final adjudication on the merits, right? That's true. By a commission of competent jurisdiction. That's true. And it's raised judicata as everything that was raised or could have been raised. That's true. Could you have raised it? With regard to the L3, L4? Certainly. I don't think that I could have, only because... You didn't know it. Because there was no findings, no objective medical findings that would have supported that particular theory. Gee, that's unfortunate. But the problem, the matter is, you were there. It relates to the event that occurred before it. I don't see how you can say you can open this thing up again. Well, if I have two choices, which is, you know, try this on a theory that there's degenerative changes at L2, L3, L3, L4, and a herniated disc at L4, L5, and the doctor writes me a report saying that, in his opinion, L4, L5 is the pain generator, but later on as he does more sophisticated testing, he comes to a conclusion that there really is a problem at the L3, L4 level, which is documented by the objective findings. And all I can tell you is that there was a diagnosis of L4 radiculopathy. And if you have a problem at the L3, L4, or the L4, L5 nerve space, even Dr. Goldberg said that you can have certain overlap of that symptomatology. So, I just think... Your time is up, Counselor. I'm sorry. You'll have time on rebuttal. Thank you. Counselor, please. Good morning, Justices, Counsel. My name is Terry Donohue, and I represent the appellee, James Pelaggi, Fred's Enterprises in this matter. It is our position that the recent Section 19H 8A Commission decision should be affirmed in all respects. First of all, we believe it's a manifest way to... the evidence question, and the Commission did properly weigh the medical evidence and the medical causation issues, which are its providence, its exclusive providence, and those should not be disturbed, and this Court has wisely pronounced that on many occasions. Now, there's plenty of evidence to support this decision. Probably some of the best evidence comes from the treating physician, Dr. Corey. The evidence in reading all of his opinions and his testimony is that his opinions simply are not credible and that they cannot be believed, and you cannot really find any consistency in his opinions. He gave testimony at his deposition that it was the L-4-5 condition, which is not related to the workers' compensation accident, and that it was only the L-3-4 level, which he did the IDEP procedure on later, which is related to the workers' comp accident. Now, it's impossible to reconcile that with a Commission decision, which we now have to work with from 2002, saying specifically that it was L-4-5, which is causally related to the accident. It's also impossible to reconcile that with Dr. Corey's own pronouncements in January of 2001. At that point, he had looked at an MRI, which showed a herniation at L-4-5, and Dr. Corey, in fact, said, well, you know what, it is L-4-5. So how you can make that statement at a deposition and expect to be believed is difficult to understand. We're recognizing, I think, the inherent and obvious problems with the claimant's position, given the earlier proceedings. So how do you respond to his argument, sort of a human kindness argument? Look, we rely on the doctors. We went to trial originally on the theory of what the medical evidence supported. Now, as he does more sophisticated technological tests, we find out that actually there was involvement at the L-3, L-4 level. So how do you respond to that? Well, I think those types of issues and that sort of weighing of the evidence is for the Commission to do, and I think that it properly did that and took into account all the evidence, the MRI studies, which I believe is, you know, arguably more reliable than a discogram. There's a fair amount of controversy and doubt regarding the reliability of a discogram, which in part relies on subjective reporting by the petitioner. Are you familiar with the case he cited that he seems to be arguing allows him to proceed on the theory he's proceeding on? Are you familiar with that case he cited in the Supreme Court? Yes, yes, I am, and I believe in that case it was actually the Commission which did in fact award increased permanency and did make an award under Section 19H, not only increasing the right leg amount but also giving an award on the left leg. And I think, again, as in this case, that's the province and that's for the Commission to do. In other words, the Commission, the Supreme Court on a manifest weight went along with the Commission. They did. We have the opposite here. He's asking to upset the Commission's decision. I believe that's true. The Commission properly did accord credibility to Dr. Goldberg's opinions and there's a lot of reasons to do so. Again, Dr. Goldberg testified that the L3-4 level for which the IDET procedure was done was not related and that the treatment to L3-4 was not related. Dr. Goldberg, when he did his examination in 2000, November of 2000, he appreciated that there were symptoms that he noted at L4-5 when he palpated the petitioner's lumbar spine. He did not note any symptoms at an L3-4 level. It was L4-5 that he focused on. And Dr. Goldberg also noted that there were injections done by Dr. Puri to the L4-5 level which, in fact, afforded the petitioner relief of his symptoms. And Dr. Goldberg explained that if it was initially an L3-4 issue or problems at L3-4, those injections would not have given him that relief. The injections would never have reached up to the L3-4 level. So if he had pain at the L3-4 level, he would still have the pain despite the injections. We submit that it's a cause of connection and to what extent the claimant is injured are manifest weight questions for the Commission to decide and that they properly did so in this instance. The appellant also brings up the idea that the Commission decision was or is erroneous as a matter of law. We believe that the Commission here did correctly review the earlier Commission decision and applied it. Apparently the appellant is taking the position that the 2002 Commission did not explicitly rule or particularly spell out that there's no causation between the L3-4 level and the work accident. Did he try it on that theory? You know, candidly, I didn't try the case initially but, you know, I suspect that he tried it based on the medical records. And he ruled out what was presented. That's correct. At any rate, if the petitioner had an issue with that, certainly appeal was available of that Commission decision if there was any concern regarding the L3-4 level being left out and certainly that was an idea floating out there since the arbitrator had addressed it. So if counsel felt that was incomplete in some way certainly an appeal was available but the Commission was very particular and specific in saying what level they thought was causally related. And then, you know, the thing with the L3-4 level was there really wasn't anything wrong or a herniated disc there to start out but the first MRI done in September 2000 as counsel stated showed simply degeneration at three different levels 2-3, L3-4 and L4-5 no herniations. And as I stated before Dr. Goldberg appreciated tenderness at the L4-5 level in November of 2000 so we begin to focus on the L4-5 level. The mistake that's made again is Dr. Khoury's and that's what the arbitrator, I think, relied upon mistakenly when in January 10 of 2001 Dr. Khoury makes a guess or speculates that the petitioner has a herniated disc at L3-4 but then there's an MRI done about a week later, January 19 and it shows what? There is no herniation, there's no change at L3-4 but that there is a herniation at L4-5 that's worsening and that he has right L4 and L5 particular symptoms and Dr. Khoury concedes all of that. So it isn't, you know, for the first time that Dr. Khoury gives a diametrically different opinion than he previously had given. And certainly the earlier commission would have said if it found the L3-4 level to be related. Again, the L3-4 topic was out there by the arbitrator and the commission instead of saying that L4-5 and L3-4 are related, specifically said L4-5 is what is causally related. Again, it was not appealed any further. So what we have here is that we have a specific injury with a specific diagnosis at L4-5 and that's based on symptoms that actually correlate with the L4-5 level and actually diagnostic MRI findings confirming that level. We actually have Dr. Khoury agreeing with that at certain points  important point. So I don't think it's being particularly too specific or picky when we're focusing on one level of the spine since the different levels of the spine do give very different symptoms. As Dr. Goldberg explains, there are different innervations which cause different symptoms and different presentations. Again, the respondent is not the insurer of the petitioner's entire lumbar spine for life which appears to be what would happen were we to reverse this decision. Certainly, you can have degeneration at other levels years later which are completely independent of the original work injury. We believe that the Section 19H88 Commission did properly fulfill its role and its responsibility in correctly reading and applying the 2002 Commission decision and weighing the evidence and made its decision fully supported by that evidence. We think the decision should be affirmed in all respects. One aspect that we didn't really get into was the medical award under Section 8A and as this panel knows, if a person has an injury that arises out of and in the course of his employment and the case is tried, theoretically Section 8A rights remain open for the patient forever provided that the petitioner can demonstrate a causal relationship between the original injury and the later medical care. Of course, if there's no causal relationship between L3-L4 and the work accident, then the Commission cut it off at the right point, didn't they? Right, but I don't think that the Commission made that specific finding. Well, but they cut it off as soon as the only L3-L4 treatment. That's true. You're talking about in December of 2002 once the district grant was done. They gave you additional 8A benefits. They did. And they cut them off when he was being treated only and exclusively for L3-L4. So if we come to the conclusion that L3-L4 has already been found to be not causally related to his work accident, then the Commission cut it off in the right place. If that's the appropriate place to cut it off. Where should they cut it off? I believe that they should have cut it off at the time of the hearing back in February and March of 2005. Why? If he wasn't being treated for L4-L5 and only L3-L4? Within that limited context I would agree with you, but it's the petitioner or plaintiff's position that the Workers' Compensation Commission was wrong. No, we understand that. If we come to the conclusion that they were right in not awarding you any 19-H benefits and they cut off the 8A at the right place. I would concede that. I would. One other thing is that with regard to this petition it's my position that once the surgery was done on January 31st of 2003 that it would have been appropriate to award temporary total disability benefits in accordance with the World Colored Press and Horace v. The Industrial Commission. Thank you. The Court will take the matter under advisory for disposition.